IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CIVIL ACTION |
| | : | |
| STANLEY J. SEGAL, | : | No. 15-1938 |
| | : | |
| Debtor | : | |
| | : | |
| ROBERT H. HOLBER, | : | Bankruptcy No. 10-16822 |
| *IN HIS CAPACITY AS CHAPTER 7* | : | |
| *TRUSTEE OF THE BANKRUPTCY ESTATE* | : | Adversary No. 14-504 |
| *OF STANLEY SEGAL, DEBTOR*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| STANLEY J. SEGAL, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                  **March 31, 2016**

Three days after receiving a discharge in his Chapter 7 bankruptcy case, debtor Stanley J. Segal filed a lawsuit in federal district court seeking to recover monies allegedly owed to him under a consulting agreement he entered before filing for bankruptcy protection.  Faced with a dispute between the parties as to whether Segal's claim to the monies belonged to Segal or his bankruptcy estate, the District Court transferred the case to the Bankruptcy Court for a determination whether the consulting agreement had been disclosed during the Chapter 7 proceedings.  The Bankruptcy Court thereafter reopened the Chapter 7 case.  In October 2014, Robert H. Holber, the Trustee of Segal's bankruptcy estate, brought the underlying adversary proceeding seeking a declaration that any monies owed under the consulting agreement are property of the estate and, after a period of discovery, moved for summary judgment.  Segal

appeals from the Bankruptcy Court's April 1, 2015, Order granting summary judgment in favor of the Trustee, arguing the monies in question are not property of the estate because they are post-petition wages, because the consulting agreement is a personal services contract, and because the Trustee abandoned any interest he may have had in the monies upon the closure of the bankruptcy case.  Segal also maintains the Bankruptcy Court exceeded the scope of the District Court's referral order in allowing the Trustee to pursue the underlying adversary proceeding.  Because the unrebutted evidence produced by the Trustee in support of his summary judgment motion establishes the monies in question are not post-petition wages but proceeds from the pre-petition sale of Segal's largest asset, and because Segal's remaining arguments lack merit, the judgment of the Bankruptcy Court will be affirmed.

**FACTS**

Before filing for bankruptcy protection, Segal and his wife owned a nursing home/long-term care facility known as Ashton Hall and an assisted living facility known as Ashton Terrace (collectively, the Facilities) through Ardsley Group, Inc., a company in which they were the sole shareholders.[1]  In April 2008, the Segals, on behalf of Ardsley, entered into a Real Estate Purchase Agreement with Green Lion Group, LLC, and Capital Family Partners, LLC (collectively, the Purchasers), wherein the Purchasers agreed to buy the Facilities from Ardsley for $8,225,000, approximately $4 million lower than the appraised value of the Facilities six months earlier.[2]  The parties simultaneously entered into an Asset Purchase Agreement, in which

---

[1] Ardsley owned Ashton Hall, Inc., and Ashton Terrace, Inc., which, in turn, owned Ashton Hall and Ashton Terrace, respectively.

[2] An independent appraisal of the Facilities prepared in October 2007 assessed their then-current "as is" market value at $12,200,000.

the Purchasers agreed to buy substantially all of Ardsley's assets used in or necessary for the operation of the Facilities for $50,000.

The sale of the Facilities closed on April 27, 2008.  Despite the $8,225,000 purchase price, Ardsley ended up paying the Purchasers $145.17 at the closing.  *See* R.67, Ex. E.[3] Approximately $3.6 million of the purchase price went to pay off first and second mortgages on the property.  Approximately $2.4 million was credited to the Purchasers:  $1.3 million for a "repair credit" and $1.1 million for a "payroll credit."  "Settlement charges" accounted for most of the remaining $2.2 million.

On April 25, 2008, two days before the sale of the Facilities closed, the Purchasers entered into a Consulting Agreement with Segal, contingent upon the sale closing.  *See* R.67, Ex. F, at ¶ 3 (cited hereinafter as "Consulting Agreement ¶ __").  In the Consulting Agreement, the Purchasers agreed to "engage [Segal] as an independent contractor to provide consulting services for the management of the Facilities for the review of finances, managerial decision making processes, reimbursements, collections and accounts receivable to aid [Purchasers] with [their] transition in ownership of the Facilities," and to "consult with [Purchasers] as to availability of real estate and health care facilities in eastern Pennsylvania."  *Id.* ¶ 1.  The Agreement specifies Segal "shall make himself available to consult with the Board of Directors, the officers of [Purchasers], and the staff, at reasonable times, concerning matters pertaining to the consultant functions listed above," but does not require him to perform any specific tasks or to work any set number of hours.  *Id.* ¶ 4.  The Agreement also includes a non-compete provision, prohibiting Segal from "serv[ing] in a consulting capacity for a nursing home or assisted living/personal care facility within a 15 mile radius of the Facilities during the term of this Agreement."  *Id.* ¶ 8.

---

[3] Citations to documents in the record on appeal appear in the form "R.__."  Citations in the form "R.__, Ex. __" are to exhibits to documents in the record on appeal.

With respect to compensation, the Consulting Agreement provides the Purchasers will pay Segal a total of $1.9 million over a term of ten years according to a fixed schedule.  Under that schedule, the Purchasers were to make two initial $250,000 payments to Segal on May 28, 2008, and June 28, 2008, and to pay the remaining $1.4 million in quarterly installments of $49,387.47, beginning June 1, 2010.  *Id.* Ex. A.  The Agreement specifies these payments "shall survive the death or disability of [Segal] and shall be paid to his rightful heirs, successors or assigns," *id.* ¶ 13, and, in the event the Purchasers sell the Facilities to a third party, the Purchasers must pay Segal the balance due under the Agreement in full upon settlement, *id.* ¶ 15. Although the Purchasers entered the Consulting Agreement with Segal individually, the Agreement allows the Purchasers to set off against the payments due to Segal certain pre-sale obligations of Ardsley for which the Purchasers might become liable as a result of their acquisition of the Facilities.  *See id.* ¶ 10.  Finally, the Consulting Agreement purports to shield the payments due thereunder from creditors of Segal or his entities, providing:

> No creditor of Stanley [Segal], Ashton Hall, Inc., Ashton Terrace, Inc. or Ardsley Group, Inc. (All four collectively "Debtors") shall have any right or power to sell, assign, convey, mortgage, pledge, anticipate, hypothecate, or otherwise dispose of any right, title, or interest that the creditor may acquire in the fees to be paid under this agreement until the fees have actually been paid over to Stanley [Segal].  Nor shall the fees to be paid or any part of them be liable for, or to any extent subject to, any debts of any kind or nature incurred or contracted by any of the Debtors. Any right granted to Stanley [Segal] to receive fees under this agreement shall not be available for the satisfaction of any claims of the creditors of any of the Debtors.  *Any right of receipt by Stanley [Segal] shall be suspended and may not be exercised by Stanley [Segal] on the filing of a proceeding in bankruptcy by Stanley [Segal].  The suspension shall be continued during bankruptcy proceedings and shall be restored only after the entry of a final order of discharge of Stanley [Segal].*  In the event a bankruptcy court finds part or all of this paragraph invalid or unenforceable, then, in the event a voluntary or involuntary bankruptcy is filed by or on behalf of any of Selling Entities or any shareholder thereof, and a bankruptcy court enters an order against [Purchasers] to pay any additional amounts due to a finding of a preferential transfer or otherwise, [Purchasers] may set this off against any amounts due to [Segal] under this agreement upon payment of these amounts to any of Selling Entities' creditors.

The terms of paragraph 10 of this Agreement shall supercede those of paragraph 11.

*Id.* ¶ 11 (emphasis added).

Eliezer Friedman and Naftali Weinberger (hereinafter, the Guarantors) personally guaranteed the Purchasers' performance of their obligations under the Consulting Agreement, *id.* ¶ 9, and also entered into a separate Unconditional Joint and Several and Irrevocable Guaranty and Suretyship Agreement (Guaranty Agreement) with Segal, personally guaranteeing "to [Segal], his heirs, executors, administrators, successors and assigns, the payment of all monies due under the [Consulting] Agreement as and when such payments shall respectively become due and payable, in accordance with the terms of the Agreement, and whether by maturity or acceleration or otherwise," *see* R.67, Ex. G.  By separate agreement, the Purchasers also granted Segal a security interest in the furniture and equipment used to operate the Facilities.  *See* R.67, Ex. H.

The Purchasers made the first two $250,000 payments to Segal on May 28, 2008, and June 6, 2008, R.67, Exs. I, J & N, at 6, though, by Segal's own admission, he had not done any work under the Consulting Agreement when these payments were made.[4]  The Purchasers did not make the first $49,387.47 payment on June 1, 2010, however, and on June 3, 2010, Segal wrote to the Guarantors reminding them the payment was due and asking them to contact him to

---

[4] At an August 2009 deposition in a separate lawsuit concerning the Facilities, Segal testified that although he had an understanding with "50 Jersey"—an entity Segal referred to throughout the deposition as the purchaser of the Facilities—that he would work for 50 Jersey and receive a salary following the closing, he had not worked for 50 Jersey since the April 27, 2008, closing date.  *See* R.67, Ex. L at 698-99.  While the precise relationship between 50 Jersey and the Purchasers is not clear from the record, it is clear 50 Jersey is a related entity to the Purchasers. Indeed, the checks for the two $250,000 payments Segal received pursuant to the Consulting Agreement were drawn from an account in the name of "50 Jersey LLC."  *See* R.67, Exs. I, J.  At oral argument in this appeal, moreover, Segal conceded his deposition testimony was that he had never worked for the Purchasers (though he now maintains this testimony was incorrect).

5

make arrangements for him to pick up a check as soon as possible.[5]  R.67, Ex. O (Ex. C to Dist. Ct. Compl.).  The Guarantors failed to respond to the letter, and on June 18, 2010, Segal's counsel wrote to both the Guarantors and the Purchasers, again advising that the first quarterly payment of $49,387.47 was due on June 1, 2010, and stating unless the payment was made within ten days, Segal would commence legal action to enforce the Consulting Agreement.  *Id.* (Ex. D to Dist. Ct. Compl.).  Counsel for the Guarantors and the Purchasers responded on June 30, 2010, enclosing a copy of a July 16, 2008, release, allegedly signed by Segal, which purports to terminate the Consulting Agreement and the Purchasers' and Guarantors' obligations thereunder.  *Id.* (Ex. E to Dist. Ct. Compl.).  Segal denies ever signing a release and maintains the signature on the release produced by the Guarantors is forged.  Despite his earlier threat, however, Segal did not bring suit upon learning the Guarantors and Purchasers would not honor their obligations under the Consulting Agreement.

On August 13, 2010, approximately two weeks after Reliant Healthcare Management, Inc. (Reliant), the former manager of the Facilities, obtained a $1.8 million judgment against Segal in an action concerning the termination of Reliant's management contract, Segal filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  Later the same month, he filed the required bankruptcy schedules.  On Schedule B, a schedule of Segal's personal property, he identified the "possible collection of monies owed under consulting agreement" as an "[o]ther contingent and unliquidated claim[]," noting collection was "doubtful" and listing the value of the property as "[u]nknown."  R.67, Ex. M.  On Schedule C, a list of property claimed as exempt, Segal identified "[a]ny remaining

---

[5] There is no evidence Segal performed any work under the Consulting Agreement between his August 2009 deposition and his June 2010 request for payment.

equity" in the "possible collection of monies owed" as exempt from the property of the estate under 11 U.S.C. § 522(d)(5)[6] and again stated the value of the property was "[u]nknown."  *Id.*  Segal also listed the Consulting Agreement on Schedule G, concerning executory contracts and unexpired leases, describing the Agreement as a "Ten Year Agreement for Consulting Services" and noting it was not being paid.  *Id.*  As part of his bankruptcy schedules, Segal completed a Statement of Financial Affairs on which he indicated he had received no income "from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business" during 2010, the calendar year in which he filed for bankruptcy protection, and had also received no such income in the two preceding calendar years.  Segal did not disclose the $500,000 he had received under the Consulting Agreement in May and June 2008.[7]

In March 2011, Segal was subject to a Rule 2004 examination in the bankruptcy case at the request of Reliant, which, by virtue of the judgment it obtained against Segal, was a major unsecured creditor in the bankruptcy.  During the examination, Segal agreed the only money he expected to realize from the sale of the Facilities was through the Consulting Agreement, R.67, Ex. K at 123-24, and the Consulting Agreement was a vehicle for him to get some payment for the sale, *id.* at 137.  Although Segal stated he thought he would be employed by the Purchasers, *id.* at 123, he conceded he never had any discussions with the Purchasers about what they

---

[6] Section 522(d)(5) allows a debtor to exempt from property of the estate the debtor's "aggregate interest in any property" up to a specified dollar amount.

[7] In his summary judgment opposition, Segal explained he did not disclose these payments because he mistakenly believed he was required to disclose amounts received during the two years immediately preceding the filing of his bankruptcy petition, rather than the two calendar years preceding the calendar year in which the petition was filed.  R.68 ¶¶ 20-21.  Segal provided this explanation only in an opposition brief filed by counsel; he did not submit an affidavit to this effect.

expected him to do, *id.* at 129-30.  When asked why he had not pursued litigation against the Purchasers and Guarantors regarding the amounts still owed to him under the Consulting Agreement, Segal stated he lacked the money to fund a lawsuit.  *Id.* at 166-67.

The following month, in April 2011, Segal and the Trustee entered into a stipulation and consent order to resolve the Trustee's objections to the exemptions claimed on Segal's Schedule C.  R.26.  The Trustee had objected that Segal's claimed exemption under 11 U.S.C. § 522(d)(5) for "any remaining equity" in four scheduled assets, including the "possible collection of monies owed" (i.e., the payments owed under the Consulting Agreement), was improper because Segal had also scheduled two assets with an aggregate value of $11,565 as exempt under § 522(d)(5), leaving only $410 available for the four assets of unspecified value.  *See* R.24.  Under the terms of the stipulation, Segal agreed to file an amended Schedule C, limiting the claimed exemption for the four assets to $410.  *See* R.26 ¶ 4.a.  Although the stipulation limited the extent to which Segal could claim the amounts owed under the Consulting Agreement were exempt from his bankruptcy estate under § 522(d)(5), it did not resolve whether the payments were excluded from property of the estate as post-petition wages owed to Segal.  Rather, the parties agreed the filing of an amended Schedule C would be "without prejudice to the rights of the Debtor to claim that any amounts owed to the Debtor set forth in Debtor's Schedule B as possible collection of monies owed under the consulting agreement . . . may constitute wages owed to the Debtor and are exempt or are not property of the Debtor's estate."  *Id.* ¶ 4.b.  In the event Segal so claimed, however, the Trustee would "have the right to file any further pleading in the Court contesting such right of [Segal] to receive such Consulting Agreement payments."  *Id.* ¶ 4.c. The Bankruptcy Court approved the stipulation on May 3, 2011.  R.27.

Eight months later, on January 16, 2012, the Trustee issued a Report of No Distribution, stating there was "no property available for distribution from [Segal's] estate over and above that exempted by law." R.4 (Jan. 16, 2012, docket entry). On June 26, 2012, the Bankruptcy Court granted Segal a discharge and closed the Chapter 7 case. R.32; R.33.

Three days after receiving the discharge, on June 29, 2012, Segal brought an action against the Guarantors in the U.S. District Court for the Eastern District of Pennsylvania (the Contract Action), alleging they breached the Consulting and Guaranty Agreements by failing to make quarterly payments owed under the Consulting Agreement and seeking damages for the breach.[8] R.67, Ex. O. The Guarantors moved to dismiss the Contract Action, in part on the basis that Segal lacked standing to pursue it, as the claims asserted were not properly disclosed on Segal's bankruptcy schedules and were property of his bankruptcy estate. Segal disputed the Guarantors' assertions, and on October 4, 2012, the Honorable C. Darnell Jones, II, to whom the Contract Action had been assigned, transferred the case to the Bankruptcy Court "for a determination as to whether or not the subject of the contract at issue was properly reported to said court and considered by the Trustee during the pendency of [Segal's] Chapter 7 Petition." R.34.

Segal thereafter moved to transfer the case back to the District Court, arguing the Trustee had abandoned any interest he may have had in funds owed under the Consulting Agreement by filing a Report of No Distribution despite his awareness of Segal's claim for monies owed under the Agreement. *See* R.35. By Order of February 6, 2013, the Bankruptcy Court denied the motion, reopened Segal's Chapter 7 case, and directed the Office of the United States Trustee to

---

[8] Segal also asserted claims for fraud and civil conspiracy based on the Guarantors' alleged forgery of Segal's signature on the release.

appoint a Chapter 7 Trustee.  R.38.  The next day, Holber was reappointed to serve as Trustee; on February 18, 2013, he withdrew his previously filed Report of No Distribution and notified the Bankruptcy Court he had discovered assets and the case was therefore an "asset case."  R.39; R.40.  The Trustee thereafter requested and received the Bankruptcy Court's authorization to employ special litigation counsel.[9]

Following his retention of counsel, the Trustee initially sought to pursue a broad-ranging adversary proceeding against Segal and various other individuals and entities connected to the 2008 sale of the Facilities, but the Bankruptcy Court dismissed the action as untimely.  In its May 1, 2014, opinion dismissing the case, the Bankruptcy Court addressed the issue on which the District Court in the Contract Action had requested a determination—namely, whether the subject of the Consulting Agreement was properly reported to the Bankruptcy Court and considered by the Trustee during the pendency of Segal's Chapter 7 petition.  R.63 at 16.  The Bankruptcy Court concluded "sufficient information about the Consulting Agreement had been reported," as evidenced by, inter alia, the May 3, 2011, Stipulation between Segal and the Trustee, which the Bankruptcy Court characterized as allowing Segal to retain any recovery from his lawsuit in excess of his $410 exemption only if he were to prevail on his claim "that any monies owed under the Consulting Agreement are post-petition wages."  *See id.* at 16-21.  Having addressed the issue the District Court referred, and having dismissed the only pending proceeding, the Bankruptcy Court ordered the Contract Action returned to the District Court. The Bankruptcy Court did not close the bankruptcy case, however, instead directing that the case

---

[9] The Bankruptcy Court's April 3, 2013, Order approving the Trustee's application to employ special litigation counsel was the subject of a previous appeal, which this Court dismissed on March 20, 2014.

would remain open to permit the Trustee to "consider the position he wishes to take, if any, here or in the District Court with respect to Segal's Consulting Agreement Claims." *Id.* at 28.[10]

In October 2014, the Trustee, represented by special litigation counsel, commenced the underlying adversary proceeding seeking a declaratory judgment that all monies owed under the Consulting Agreement are property of Segal's estate. On February 27, 2015, the Trustee filed a motion for summary judgment in the underlying adversary proceeding, arguing undisputed evidence in the record showed the monies owed under the Consulting Agreement are proceeds of the sale of the Facilities—not post-petition wages—and are therefore property of the estate. Segal filed a written response to the motion, but submitted no affidavits or other evidence in support of his opposition, even though he maintained there were genuine issues of material fact precluding summary judgment. Following oral argument on the motion on April 1, 2015, the Bankruptcy Court entered an Order granting summary judgment in favor of the Trustee and declaring that "such monies as may be owed under the Consulting Agreement described in [the Trustee's] Complaint for Declaratory Relief are property of the Debtor's bankruptcy estate, and are not post-petition wages of the Debtor." R.69. The Bankruptcy Court supplemented this Order with a written opinion on April 22, 2015, holding Segal had failed to create a genuine dispute as to any material fact and the Trustee's unrebutted evidence established the payments under the Consulting Agreement are not wages. Segal appeals from this ruling.

---

[10] After receiving the Bankruptcy Court's Opinion and Order, the District Court directed the parties to submit a status report in the Contract Action. The Contract Action, however, has remained closed during the pendency of the instant adversary proceeding, including this appeal.

**DISCUSSION**

The Bankruptcy Court's Order granting summary judgment in favor of the Trustee on his claim for declaratory relief is a final order which this Court has jurisdiction to review under 28 U.S.C. § 158(a)(1).   A district court reviews a bankruptcy court order granting summary judgment de novo, applying the same standard the bankruptcy court applied.  *See Dick ex rel. Amended Hilbert Residence Maint. Tr. v. Conseco, Inc.*, 458 F.3d 573, 577 (7th Cir. 2006); *Pettit v. Smith*, 241 B.R. 847, 849-50 (Bankr. E.D. Pa. 1999).  Under Federal Rule of Civil Procedure 56, which governs summary judgment in adversary proceedings, *see* Fed. R. Bankr. P. 7056, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where, as here, a party seeks summary judgment on an issue on which it will bear the burden of proof at trial,[11] the moving party must support its motion "with

---

[11] The Bankruptcy Court held the Trustee had the burden of proving whether monies owed under the Consulting Agreement are property of the estate.  R.3 at 5 (citing *In re Datesman*, No. 98-30369, 1999 WL 608856, at *2 (Bankr. E.D. Pa. Aug. 9, 1999) ("The burden of proof as to what is property of the estate generally rests with the creditor.")).  The parties do not challenge this holding.  *Accord Rex-Tech. Int'l, LLC v. Rollings (In re Rollings)*, 451 F. App'x 340, 345 (5th Cir. 2011) (holding the burden of proof in a bankruptcy court action for declaratory relief as to the ownership of disputed property was on the party making an affirmative claim for relief).

credible evidence . . . that would entitle [it] to a directed verdict if not controverted at trial." *Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 237 (3d Cir. 2003) (ellipsis in original) (citation omitted); *see also El v. Se. Pa. Trans. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007) (holding a party moving for summary judgment on an issue on which it bears the burden of proof at trial "must show that it has produced enough evidence to support the findings of fact necessary to win"). In considering the evidence, the court must draw all reasonable inferences in favor of the nonmoving party. *El*, 479 F.3d at 238. If the moving party satisfies its burden, the nonmoving party "can defeat summary judgment if it . . . produces or points to evidence in the record that creates a genuine issue of material fact." *Id.* The nonmoving party "cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." *Id.*

Segal also challenges the Bankruptcy Court's decision to reopen his Chapter 7 case. On this issue, the standard of review is abuse of discretion. *In re Zinchiak*, 406 F.3d 214, 222 (3d Cir. 2015) ("[T]he decision of the Bankruptcy Court to reopen a previously closed bankruptcy proceeding is reviewed for abuse of discretion.").

"The filing of a voluntary petition in the bankruptcy court commences a bankruptcy case and creates a bankruptcy estate" comprised of the property identified in 11 U.S.C. § 541(a). *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001); *see also* 11 U.S.C. § 541(a). Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), a definition that "sweep[s] broadly," encompassing "all kinds of property, including tangible or intangible property, causes of action[,] . . . and any all other forms of property currently specified in section 70a of the Bankruptcy Act" (the predecessor to the current Bankruptcy Code), *Westmoreland*

*Human Opportunities*, 246 F.3d at 241 (ellipsis in original) (citation omitted).  This definition "does not include the wages a debtor earns . . . *after* the bankruptcy filing."  *Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015); *see also FDIC v. Clark (In re Clark)*, 960 F.2d 475, 477 (5th Cir. 1992); *In re Gillen*, 69 B.R. 255, 257 (E.D. Pa. 1986).  Property of the estate also includes any "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case."  11 U.S.C. § 541(a)(6).  The exception in § 541(a)(6) for post-petition earnings of the debtor is construed narrowly to encompass only those payments received by the debtor post-petition that are "attributable to post-petition services actually rendered by the debtor."  *Longaker v. Boston Sci. Corp.*, 715 F.3d 658, 662 (8th Cir. 2013); *see also Stinnett v. Laplante (In re Stinnett)*, 465 F.3d 309, 313 (7th Cir. 2006).

The two overarching purposes of the Bankruptcy Code are "to provide for the efficient and equitable distribution of an insolvent debtor's remaining assets to its creditors" and "to provide debtors with a 'fresh start' by relieving them of the weight of their outstanding debts and permitting them to reorganize their affairs."  *Westmoreland Human Opportunities*, 246 F.3d at 251.  The definition of property of the estate in § 541 serves these purposes by marshaling the debtor's pre-petition assets, i.e., "those assets rooted in the debtor's pre-petition activities, including any proceeds that may flow from those assets in the future," into the estate while allowing the debtor "to exclude from his estate any compensation or salary he might earn after the date of the petition."  *See Andrews v. Riggs Nat'l Bank of Wash., D.C. (In re Andrews)*, 80 F.3d 906, 910 (4th Cir. 1996).  Consistent with these purposes, in determining whether post-petition payments under a pre-petition contract belong to the debtor or the estate, courts have looked to whether the payments are "sufficiently rooted in the pre-bankruptcy past and so little

entangled with the bankrupt['s] ability to make an unencumbered fresh start" that they should be regarded as property of the estate. *Id.* (quoting *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)); *see also, e.g.*, *Rau v. Ryerson (In re Ryerson)*, 739 F.2d 1423, 1426 (9th Cir. 1984); *Johnson v. Taxel (In re Johnson)*, 178 B.R. 216, 218 (B.A.P. 9th Cir. 1995); *In re Powell*, 511 B.R. 107, 111 (Bankr. C.D. Ill. 2014).[12]  If so, the payments are property of the bankruptcy estate, except to the extent that they are attributable to services performed by the debtor post-petition.  *See, e.g.*, *Ryerson*, 739 F.2d at 1426; *Walsh v. Bosack (In re Bosack)*, 454 B.R. 625, 631-32 (Bankr. W.D. Pa. 2011).

The dispute in this case centers primarily on whether the monies due to Segal under the Consulting Agreement are earnings for services to be provided by him post-petition or proceeds from the pre-petition sale of the Facilities.  Segal argues the payments outlined in the Agreement represent compensation for his consulting services and non-compete agreement, which—apart from the initial quarterly payment due June 1, 2010, and the two payments he received in May

---

[12] This standard derives from *Segal v. Rochelle*, in which the Supreme Court held claims for loss-carryback tax refunds based on losses suffered and net income taxes paid by the debtors before they filed for bankruptcy protection were property of the debtors' estates.  *See* 382 U.S. at 380 (holding the loss-carryback refund claims were "sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that [they] should be regarded as 'property' under § 70a(5) [of the Bankruptcy Act]").  Although *Segal* was decided under the Bankruptcy Act, courts have continued to rely on the standard articulated therein in cases decided under the Bankruptcy Code.  *See, e.g.*, *In re Meyers*, 616 F.3d 626, 628 (7th Cir. 2010) (characterizing the *Segal* standard as a "background rule under the old Bankruptcy Act, to which courts still refer in the era of the Bankruptcy Code"); *Andrews*, 80 F.3d at 910-11 (applying the *Segal* standard to determine whether post-petition payments under a pre-petition non-compete agreement were property of the debtor's estate); *Ryerson*, 739 F.2d at 1423 (concluding the Bankruptcy Code "follows *Segal* insofar as it includes after-acquired property 'sufficiently rooted in the prebankruptcy past' but eliminates the requirement that it not be entangled with the debtor's ability to make a fresh start").  *But see Burgess v. Sikes (In re Burgess)*, 438 F.3d 493, 498 (5th Cir. 2006) (en banc) (holding "although Congress has specifically approved of *Segal*'s result, *Segal*'s 'sufficiently rooted' test did not survive the enactment of the Bankruptcy Code" (footnote omitted)).

and June 2008—he had not yet earned when he filed his bankruptcy petition in August 2010. Segal also maintains the Consulting Agreement and any remaining payments owed thereunder are excluded from the bankruptcy estate because the Agreement is a personal services contract. The Trustee contends, inter alia, the payments owed to Segal under the Consulting Agreement are not post-petition earnings but deferred compensation for the pre-petition sale of the Facilities.[13]

The Trustee's argument is supported by ample, unrebutted evidence in the summary judgment record.   The Consulting Agreement was executed in connection with the pre-bankruptcy sale of the Facilities, and the circumstances surrounding the sale strongly suggest the Agreement was a vehicle for Segal to receive proceeds of the sale.   The $8 million purchase price listed in the sale documents was almost $4 million lower than the Facilities' appraised value only six months before the sale, and Segal received nothing at closing, instead paying the Purchasers $145.17.   Yet contemporaneously with the sale, Segal entered into the $1.9 million Consulting Agreement, which provided for almost immediate payment of $500,000, to be followed, two years later, by a string of quarterly payments of $49,387.47 for the next eight years.   Segal admitted the Consulting Agreement represented the only money he expected to

---

[13] Although the parties frame the issue as whether the monies due to Segal under the Consulting Agreement are post-petition *wages*, it is not clear to this Court that wages is the salient classification.   Under § 541(a)(1), the dispositive issue is whether the debtor has a legal or equitable interest in the payments as of the commencement of the case, not whether the payments are wages.   *See Clark*, 960 F.2d at 477 (holding a football player's earnings from games played after he filed for bankruptcy protection were not property of his bankruptcy estate under § 541(a)(1)).   And § 541(a)(6) refers to "*earnings* from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6) (emphasis added).   The term "earnings" is broader than "wages" and has been interpreted to "refer[] to all income generated by an individual," not just wages and salary.   *See In re Evans*, 464 B.R. 429, 435-36 (Bankr. D. Colo. 2011) (quoting *Litzler v. Sholdra (In re Sholdra)*, 270 B.R. 64, 69 (Bankr. N.D. Tex. 2001)).

realize from the sale, and he suggested the original idea behind the Agreement was that it would be a way to get some payment for the sale.[14]  The close interrelationship between the sale and the Consulting Agreement is further evidenced by the Agreement's set-off provision, which allows the Purchasers to set off expenses they may incur for pre-sale obligations of Ardsley against amounts owed to Segal under the Agreement.

Although Segal argues the payments owed under the Consulting Agreement are for consulting services, he admittedly received the first two $250,000 payments without performing any services under the Agreement and then failed to disclose those 2008 payments as income received from employment, trade, profession, or business in the two calendar years preceding 2010, the year he filed for bankruptcy protection, on his Statement of Financial Affairs.  Indeed, in August 2009, more than a year after he executed the Agreement, Segal acknowledged he had never worked for the Purchasers.[15]  While Segal maintains there are factual issues as to whether he may be required to perform services under the Consulting Agreement in the future, the only

---

[14] Segal argues there are issues of fact surrounding "whether there was an admission that payments under the Consulting Agreement were the proceeds from the sale of Ashton Hall." Appellant's Br. 4.  While Segal's testimony regarding the Consulting Agreement may fall short of an admission on the ultimate issue of the character of the payments in question, his testimony nevertheless supports the Trustee's position.  Notably, Segal offers no contrary interpretation of, or context for, his prior statements regarding the Consulting Agreement.  Although Segal also argues there are factual disputes as to whether the October 2007 appraisal of the Facilities was accurate or inflated and whether there were intervening circumstances that reduced the value of the Facilities in the six months between the appraisal and the sale, he produced no evidence to support either assertion.

[15] Now, on appeal, Segal suggests he "can present testimony that he did perform services under the Consulting Agreement," Appellant's Reply Br. 7, but this argument comes too late as Segal failed to produce or point to any evidence of such services in the Bankruptcy Court and offers no explanation as to why he did not present such testimony by affidavit in support of his summary judgment motion.

evidence he offers on this point is the Agreement itself.[16]  Given the undisputed evidence that Segal received the first two payments under the Agreement without performing any consulting services, the Agreement alone is not a basis on which a reasonable trier of fact could find the payments are for services to be provided by Segal.  The Agreement does not require Segal to perform any particular services, but provides only that he "shall make himself available to consult with" the Purchasers and their representatives "at reasonable times."  Consulting Agreement ¶ 4.  Moreover, the payments required under the Agreement are not tied in any way to services actually performed by Segal, but are to be made according to a fixed schedule under which more than a quarter of the proceeds of the Agreement are to be paid in the first two months of its ten-year term.  Provisions specifying that payments to Segal are to continue in the event of his death or disability and that the balance due under the Agreement is to be paid in full to Segal in the event the Purchasers sell the Facilities to a third party underscore the lack of correspondence between the payments outlined in the Agreement and any services to be provided as, under both provisions, payments continue despite the cessation of services.  Finally, the Agreement suspends all payments to Segal in the event of, and during the pendency of, any bankruptcy proceedings, a provision that would be entirely unnecessary if the payments were actually for post-petition services to be provided by Segal.[17]

---

[16] Insofar as Segal cites the parties' May 3, 2011, stipulation as evidence the Trustee agreed that payments under the Consulting Agreement constitute wages owed to Segal and are not property of the estate, *see* Appellant's Br. 6, the stipulation itself refutes this interpretation.  In the stipulation, Segal reserved the right to claim that any amounts owed to him under the Consulting Agreement "may constitute wages owed to the Debtor and are exempt or are not property of the Debtor's estate," R.27 ¶ 4.b.  But, far from conceding the point, the Trustee specifically reserved the right "to file any further pleading in the Court *contesting* such right of the Debtor to receive such Consulting Agreement payments."  *Id.* ¶ 4.c. (emphasis added).

[17] The unusual procedural posture of this case reinforces the Trustee's position that any monies ultimately recovered under the Consulting Agreement will not be for services actually performed

The foregoing unrebutted evidence amply demonstrates that any monies owed to Segal under the Consulting Agreement are proceeds of the sale of the Facilities, not compensation for any post-petition services performed by him.  The bankruptcy court reached a similar conclusion regarding post-petition payments owed to a debtor under a pre-petition "Personal Services Consulting Agreement" in *In re Luria*, 175 B.R. 601 (Bankr. D. Md. 1994), *subsequently aff'd*, 103 F.3d 118 (4th Cir. 1996) (unreported).  In that case, the court held the payments were a quid pro quo for the debtor's execution of a settlement agreement that extinguished his interest in the hotel that was the subject of the consulting agreement, and were therefore property of the debtor's estate, where the consulting agreement (1) was "inexorably intertwined" with the settlement agreement, (2) did not require the debtor to perform any particular services but only to hold himself available to consult as called upon, and (3) compensated the debtor according to a fixed, front-loaded payment schedule which did not correlate to the actual services provided by

---

by Segal.  Segal filed the Contract Action to recover the balance allegedly owed under the Consulting Agreement as damages for breach of contract after learning in June 2010 that the Guarantors take the position the Agreement was terminated pursuant to a July 2008 release.  As a result of the Contract Action, the Trustee brought this declaratory judgment action so as to enable him to "intervene as the real party in interest in [the Contract Action] wherein the Debtor is seeking to recover the monies owed under the Consulting Agreement."  R.65 ¶ 7.  Although Segal did not file the Contract Action until after the Bankruptcy Court granted him a discharge, he was fully aware of the Guarantors' repudiation of the Consulting Agreement before he filed his bankruptcy petition, *see* R.67, Ex. O (Exs. C-E to Dist. Ct. Compl.), and the breach of contract claim is therefore property of his estate, *see O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197, 202 (3d Cir. 2000) (recognizing a pre-petition cause of action is property of the estate).  Insofar as the Consulting Agreement payments are recovered in the Contract Action, such payments will not be for any services actually performed by Segal but will be damages for his pre-petition breach of contract claim and will therefore be property of the estate.  *See Venn v. Sherman (In re Sherman)*, 322 B.R. 889, 892-93 (Bankr. N.D. Fla. 2004) (holding lost future wages recovered pursuant to a pre-petition cause of action are property of the estate); *cf. Stinnett*, 465 F.3d at 313 (rejecting the argument that disability payments under an insurance policy in which the debtor had a pre-petition interest were property of the estate under § 541(a)(6); although such payments were intended to be a substitute for earned wages, they were available only when a policyholder was incapable of performing services).

the debtor, who received the first several monthly payments without rendering any services.  *Id.* at 605-07.

Nor does the inclusion of a non-compete provision in the Consulting Agreement alter the Court's analysis.  To the contrary, as other federal courts have recognized, post-petition payments under a pre-petition non-compete agreement are property of the debtor's bankruptcy estate where, as here, the non-compete agreement was intertwined with the pre-petition sale of the debtor's business.  *See, e.g.*, *Andrews*, 80 F.3d at 910-11 (holding post-petition payments under a pre-bankruptcy non-compete agreement the debtor entered in connection with the sale of a business in which the debtor was a part owner were "sufficiently rooted in the [debtor's] pre-bankruptcy past" that they belonged to the estate where the non-compete agreement was "an integral part" of the sale); *Johnson*, 178 B.R. at 218-19 (holding payments under a pre-bankruptcy non-compete agreement executed in connection with the sale of the debtor's car dealership were "sufficiently rooted in the pre-bankruptcy past to be included in the estate" because they were "a method of paying for the value of [the debtor's] name, and for insuring that [the purchaser of the dealership] will receive all of the good will previously owned by [the debtor]"); *cf. United States v. Kennedy*, 234 F.3d 1263 (2d Cir. 2000) (unpublished) (holding non-compete payments were not exempt from the debtor's bankruptcy estate as earnings from post-petition services under § 541(a)(6) because the non-compete agreement was inextricably intertwined with the debtor's sale of stock that "was an includable bankruptcy asset that predated [debtor's] bankruptcy petition").  As numerous courts have recognized, moreover, payments pursuant to a pre-petition non-compete agreement do not come within the earnings exception in § 541(a)(6) because a debtor's forbearance from competition does not constitute the performance of services by the debtor.  *See, e.g.*, *Andrews*, 80 F.3d at 911-12; *Johnson*, 178 B.R. at 219-20;

*Unsecured Creditors Comm. v. Prince (In re Prince)*, 127 B.R. 187, 192 (N.D. Ill. 1991), *aff'd*, 85 F.3d 314 (7th Cir. 1996).  *But see In re Hammond*, 35 B.R. 219, 223 (Bankr. W.D. Okla. 1983) (holding post-petition payments due to the debtor under a pre-petition non-compete agreement were not property of the estate because the debtor "ha[d] not done all acts necessary to accrue his right to the future payments").

Segal also argues monies owed under the Consulting Agreement cannot be property of the estate because the Agreement is a personal services contract.[18]  "A personal services contract has been defined as '[a] contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability.'"  *Doltz v. Harris & Assocs.*, 280 F. Supp. 2d 377, 388 (E.D. Pa. 2003) (quoting *In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986)).  Because a trustee may not assume or assign an executory contract for personal services without the parties' consent, *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 106-07 (3d Cir. 1990), some courts have held such a contract is excluded from the bankruptcy estate, *see, e.g.*, *Skiba v. Bimber (In re Bimber)*, 318 B.R. 297, 299 (Bankr. W.D. Pa. 2004) (collecting cases); *accord* 5 *Collier on Bankruptcy* ¶ 541.06[2] (16th ed. 2015) ("If a contract entails postpetition services to be performed by a debtor, such contract, and all proceeds from it, are excluded from the estate in chapter 7 or 11 cases pursuant to section 541(a)(6).").

Segal argues the Consulting Agreement is a personal services contract because it requires him to perform services utilizing his special knowledge of the eastern Pennsylvania market for

---

[18] This issue is arguably waived as Segal made a single reference to "personal services" in his 82-paragraph Answer in the underlying adversary proceeding, but did not raise this argument in his summary judgment opposition or at oral argument on the motion.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000) (holding issue not raised in the bankruptcy court was waived on appeal).

health care-related facilities and to refrain from consulting for competitor nursing homes and assisted living/personal care facilities, a covenant that only he can perform.  This argument is wholly speculative and ignores the substantial evidence in the summary judgment record that the Consulting Agreement payments are not earnings for services provided by Segal but compensation for the pre-petition sale of the Facilities, including evidence that Segal never actually provided any personal services under the Agreement.  Further, the Trustee is not seeking to assume the Consulting Agreement but to pursue Segal's pre-petition breach of contract claim; hence, even if the Agreement were a personal services contract, its status as such would not render the proceeds of the pre-petition cause of action property of the estate.  *See* n.17, *supra*.[19]

---

[19] Segal also argues the Bankruptcy Court erred in concluding the Consulting Agreement payments could only constitute post-petition wages if the Agreement created an employer-employee relationship between the Purchasers and Segal under Pennsylvania law.  This Court agrees with Segal that whether the payments are excluded from the estate as post-petition earnings does not turn on whether the payments were made within the confines of an employer-employee relationship.  *See Evans*, 464 B.R. at 435-56 (holding the term "earnings," for purposes of § 541(a)(6), "is not limited to 'wages and salary,'" but refers to "all income generated by an individual" (citation omitted)); *Bosack*, 454 B.R. at 630-33 (holding commissions due to the debtor under an "Agent Agreement" that designated him an independent contractor were partially excluded from the estate under § 541(a)(6); although the debtor obtained the customer contracts that generated the commissions pre-petition, the commissions were also partially dependent upon the debtor's continued servicing of the accounts post-petition).  The lack of an employer-employee relationship, however, was not the only basis for the Bankruptcy Court's conclusion that any monies owed to Segal under the Consulting Agreement are property of the estate.  Rather, the Bankruptcy Court also credited the Trustee's other arguments for summary judgment, including the argument that the monies are actually deferred proceeds from the sale of the Facilities, which the Court found was "supported by evidence in the record."  R.3 at 5.

   While Segal takes issue with the Bankruptcy Court's application of Pennsylvania law, he appears to agree the issue whether the payments under the Consulting Agreement constitute wages should be decided under Pennsylvania law.  *See* Appellant's Br. 6-7 (arguing that, under Pennsylvania law, payments owed under a consulting agreement are wages when services are to be performed by the consultant, citing *Jefferson Bank v. Morris*, 639 A.2d 474, 477-78 (Pa. Super. Ct. 1994)).  In *Jefferson Bank*, the court addressed 42 Pa. Cons. Stat. Ann. § 8127(a), which exempts "from any attachment, execution or other process" the "wages, salaries and commissions of individuals . . . while in the hands of the employer," subject to certain enumerated exceptions.  As the Bankruptcy Court recognized in its May 1, 2014, Opinion, a

Based on the unrebutted evidence in the summary judgment record, no reasonable trier of fact could find the monies owed to Segal under the Consulting Agreement are earnings for personal services to be provided by Segal post-petition.  Rather, the evidence unequivocally shows Segal the payments are proceeds of the pre-petition sale of the Facilities.  The Bankruptcy Court thus did not err in holding Segal had failed to establish the existence of any genuine issue of material fact and any monies owed under the Consulting Agreement are not post-petition wages.

Segal also argues the Consulting Agreement payments are not property of the estate because the Trustee abandoned any interest he may have had in those monies by failing to take action with respect to such payments before the bankruptcy case was closed.  Because Segal did not raise this issue in the adversary proceeding, either in his Answer or in his summary judgment opposition,[20] however, the issue is waived.  *See Buncher Co.*, 229 F.3d at 253 (holding an issue not raised in the bankruptcy court was waived on appeal).

---

debtor's pre-petition wages, while property of the bankruptcy estate, may qualify for an exemption under § 8127(a) if the debtor chooses to avail himself of the exemptions provided under state law.  *See* R.63 at 18 n.3.  Segal, however, "claimed the exemptions available to him under Federal not State law," *id.*, so it is not clear why the status of the Consulting Agreement payments as wages under § 8127(a) is relevant.  *See Clark v. Rameker*, 134 S. Ct. 2242, 2244 n.1 (2014) ("Under [11 U.S.C.] § 522, debtors may elect to claim exemptions either under federal law, *see* § 522(b)(2), or state law, *see* § 522(b)(3)."); *cf. Bosack*, 454 B.R. at 630, 633-35 (considering whether commissions earned pre-petition were exempt under § 8127(a) where the debtor "elected to take the exemptions available to him under 11 U.S.C. § 522(b)(3), that is essentially Pennsylvania state exemptions and the property that he owns with his nondebtor wife as a tenant by the entirety").  The Court also notes it is not at all clear Segal's interpretation of Pennsylvania law is correct.  *See Bosack*, 454 B.R. at 633 (holding § 8127(a) "has no application when an individual works for another as an independent contractor because, in such event, the person or entity for whom such individual works is not, indeed cannot be, such individual's employer").

[20] Segal did raise the issue of abandonment immediately following the transfer of the Contract Action to the Bankruptcy Court, urging that Court to return the action immediately to the District Court because the right to enforce any claim under the Consulting Agreement had reverted to

In any event, Segal's abandonment argument lacks merit.  Under 11 U.S.C. § 554(c), "[u]nless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title."  The Trustee does not dispute that Segal's claim for monies owed under the Consulting Agreement was disclosed in his bankruptcy schedules.[21]  Rather, the Trustee argues the claim was not abandoned because the parties' stipulation and consent order, which the Bankruptcy Court approved on May 3, 2011, specifically preserved the Trustee's right to litigate Segal's right to receive the Consulting Agreement payments in the event Segal claimed the payments were excluded from his bankruptcy estate as wages.  This Court agrees.

In the stipulation, the parties agreed (1) Segal's exemption under § 522(d)(5) for the "possible collection of monies owed" under the Consulting Agreement would be limited to $410; (2) notwithstanding this limitation, Segal could claim any amounts owed to him under the Consulting Agreement constitute wages and are therefore exempt from or not property of his bankruptcy estate; and (3) in the event Segal so claimed, the Trustee could "file any further pleading in the Court contesting such right of [Segal] to receive such Consulting Agreement

---

Segal upon the Trustee's filing of a Report of No Distribution.  *See* R.35.  The Guarantors opposed Segal's motion to transfer, arguing the Bankruptcy Court should, at a minimum, hold a hearing regarding the sufficiency of Segal's disclosures regarding the Consulting Agreement. *See* R.36.  Siding with the Guarantors, the Bankruptcy Court denied the motion to transfer and exercised its discretion under 11 U.S.C. § 350(b) to reopen the bankruptcy case.  *See* R.38; R.63 at 13 (noting the Court reopened the bankruptcy case upon concluding "that overall the situation did not pass . . . 'the smell test'").  The court did not rule on the abandonment issue, and Segal did not thereafter assert abandonment as a defense in the declaratory judgment action.

[21] As the Bankruptcy Court recognized in its May 1, 2014, Opinion, this claim "was scheduled as an asset, albeit with unknown value and questionable collectability."  R.63 at 16; *see also id.* at 18 (finding "it cannot plausibly be maintained that the Trustee had been in the dark about the particulars of the Consulting Agreement during the pendency of the case").

payments." R.27. While the stipulation resolved the parties' dispute regarding the extent to which the monies owed under the Consulting Agreement were exempt from property of the estate under § 522(d)(5), it did not resolve whether the balance of any monies owed were exempt as post-petition wages. To the contrary, the parties expressly agreed to defer this issue for future litigation in the Bankruptcy Court.

At oral argument, Segal took the position the stipulation preserved the Trustee's right to litigate the estate's claim to the Consulting Agreement payments only until the Chapter 7 case was closed. But nothing in the stipulation itself suggests such a limitation. The stipulation is extremely broad, preserving the Trustee's right to file "any further pleading in the Court" contesting Segal's right to receive monies owed under the Consulting Agreement in the event Segal sought to retain such amounts as post-petition wages. Under the terms of the stipulation, the Trustee's right to litigate ownership of the monies owed under the Consulting Agreement is triggered by Segal's claim that the monies are excluded from the estate as post-petition wages, a claim Segal raised in the Bankruptcy Court in his motion to transfer. *See* R.35 (Decl. of Robert E. Chernicoff, Esq. ¶ 5). As the Bankruptcy Court noted in addressing whether the Consulting Agreement was properly reported to the Bankruptcy Court during the bankruptcy case, the stipulation was intended to protect the estate's interests in the event Segal later pursued a claim based on the Consulting Agreement. *See* R.63 at 27; *see also id.* at 20 (concluding that, given the estate's lack of funds or other means with which to initiate litigation based on the Consulting Agreement, the Trustee dealt with the Agreement appropriately by entering into the stipulation under which "[i]f Segal prevails in his lawsuit, but cannot prove that any monies owed are post-petition wages, any funds recovered would presumably belong to the Estate," but "[i]f Segal proves that there are monies owed, and that the monies at issue constitute post-petition wages,

then the Estate is no worse off as a result").  Segal's argument that the Trustee abandoned any interest he may have had in the monies owed under the Consulting Agreement is therefore without merit.

Finally, Segal argues the Bankruptcy Court improperly reopened the bankruptcy case and expanded the scope of the District Court's referral by allowing the Trustee to litigate this adversary proceeding.  This Court disagrees.  Under 11 U.S.C. § 350(b), a bankruptcy court may reopen a case—on motion of a party or on its own motion—"to administer assets, to accord relief to the debtor, or for other cause."  *See Donaldson v. Bernstein*, 104 F.3d 547, 552 (3d Cir. 1997) (holding a bankruptcy court is empowered to reopen a bankruptcy case on its own motion under 11 U.S.C. § 105(a)).  Here, the Bankruptcy Court had cause to reopen the Chapter 7 case based on the District Court's transfer of the Contract Action for a determination whether the Consulting Agreement was properly reported to the Bankruptcy Court and considered by the Trustee during the pendency of Segal's Chapter 7 case.

As noted, the Bankruptcy Court addressed the issue referred by the District Court in its May 1, 2014, Opinion and Order, holding the Consulting Agreement was properly reported to the Bankruptcy Court and the Trustee.  Upon resolving this issue—and having dismissed the only pending adversary proceeding as untimely—the Bankruptcy Court ordered the Contract Action returned to the District Court.  Recognizing that the Trustee had a stake in the outcome of the Contract Action based on the parties' stipulation, however, the Bankruptcy Court directed that the bankruptcy case would "remain open for the time being so that the Trustee may consider the position he wishes to take, if any, here or in the District Court with respect to Segal's

26

Consulting Agreement Claims." R.63 at 28. The Trustee thereafter filed the adversary proceeding that is the subject of this appeal.[22]

Having properly reopened the Bankruptcy Case upon the District Court's referral, and having properly determined the stipulation and consent order preserved the Trustee's right to litigate whether the monies owed under the Consulting Agreement belong to Segal or the estate, the Bankruptcy Court appropriately exercised jurisdiction in the underlying adversary proceeding. An action for a declaratory judgment that a particular asset is property of a bankruptcy estate under 11 U.S.C. § 541 is a core proceeding within the bankruptcy courts' jurisdiction under 28 U.S.C. § 157(b)(2). *See Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*, 515 B.R. 107, 115 (Bankr. D. Del. 2014). Indeed, Segal conceded as much in his Answer in this adversary proceeding. *See* R.66 at 4 (admitting the Bankruptcy Court had jurisdiction over the claims raised in the adversary proceeding under 28 U.S.C. § 157 and 1334). Thus, insofar as Segal contends the Bankruptcy Court lacked jurisdiction to consider this adversary proceeding, the Court rejects that argument.

Because the Bankruptcy Court properly concluded the unrebutted evidence in the summary judgment record establishes the monies owed to Segal under the Consulting Agreement are property of Segal's bankruptcy estate, and because Segal's remaining arguments lack merit, the judgment of the Bankruptcy Court will be affirmed. An appropriate Order follows.

BY THE COURT:


____/s/ Juan R. Sánchez_____
Juan R. Sánchez, J.

---

[22] Notably, the District Court did not reopen the Contract Action upon receipt of the Bankruptcy Court's opinion, and has not reopened the case while proceedings have been ongoing in the Bankruptcy Court, suggesting the District Court did not perceive the Bankruptcy Court to have improperly exceeded the scope of the referral.